E-FILED
Thursday, 05 February, 2026 03:58:41 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | |
|---|---|
| RACHEL LESSEN,<br>on behalf of Plaintiff and the class members<br>described below, | )<br>)<br>) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| FSST MANAGEMENT SERVICES, LLC<br>d/b/a 605 Lending;<br>STEVE CHRISTENSEN;<br>DUSTIN DERNIER;<br>INFINITY ENTERPRISE LENDING SYSTEMS,<br>a limited liability company;<br>LEAD BANK;<br>DEBT DIRECT PORTFOLIO<br>MANAGEMENT LLC;<br>UNITED MEDIATION PARTNERS LLC;<br>and JOHN DOES 1-20, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| | ) |
| Defendants. | ) |

## COMPLAINT – CLASS ACTION AND DEMAND FOR JURY TRIAL

1.      Plaintiff Rachel Lessen brings this action to secure redress from predatory and unlawful loans (such as <u>Exhibit A</u>) made by Defendant FSST Management Services, LLC d/b/a 605 Lending.  Also sued are Steve Christensen and Dustin Dernier, who are or hold themselves out as officers of FSST Management, Infinity Enterprise Lending Systems, which provides software for the underwriting, servicing, and collection of the loans, Lead Bank, which provides ACH and debit card payment processing services, Debt Direct Portfolio Management LLC, which allegedly owns the debt, United Mediation Partners LLC, which has attempted to collect the debt, and John Does 1-20.

2.      Equitable relief is sought; Plaintiff seeks a declaratory judgment that the loans are void and an injunction against their collection (Count I) damages pursuant to the Illinois Interest Act, 815 ILCS 205/6 (Count II), damages pursuant to the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 et seq., and the Illinois Consumer Fraud Act, 815 ILCS 505/1 et seq. (Count III – the Predatory Loan Prevention Act provides that violations are a violation of the Illinois

1

Consumer Fraud Act), treble damages under RICO (Count IV), and damages pursuant to the Fair

Debt Collection Practices Act, 15 U.S.C. §1692 et seq. (Count V).

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction under 28 U.S.C. §1331 (general federal

question), 15 U.S.C. §1692k (FDCPA), 18 U.S.C. §1964 (RICO), 28 U.S.C. §1337 (interstate

commerce), 28 U.S.C. §1367 (supplemental jurisdiction); and 28 U.S.C. §1332(d) (Class Action

Fairness Act).

4.      This Court has personal jurisdiction over each Defendant because they:

a.      Knowingly participated in the making and collection of unlawful loans to

        Illinois residents. In similar actions against purported "tribal" lenders, courts

        have held that personal jurisdiction over the persons involved in making the

        loans exists in the state where the borrower obtained a loan via the Internet,

        and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*,

        5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D.

        Vt. May 18, 2016)*, aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d

        Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would

        have been sufficient to subject [the tribal entity] to personal jurisdiction in

        Vermont" for purposes of claims for violations of state and federal law,

        including state usury laws and RICO, where tribal entity operated a website

        that advertised loans in Vermont, sent emails and loan applications to

        Vermont consumers and transferred loan principal to consumers' Vermont

        bank accounts); *Duggan v. Martorello*, 18cv12277, 2022 U.S. Dist. LEXIS

        58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue

        Dart Ventures*, 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1,

        2021).

b.      Selected which states to offer loans in, thereby targeting those states. *Illinois v.*

*Hemi Group, LLC*, 622 F.3d 754, 760 (7th Cir. 2010).

5.      Venue is proper because acts to obtain and collect the loans impacted Plaintiff in Illinois.

6.      Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

### Plaintiff

7.      Plaintiff Rachel Lessen is a citizen of Illinois residing in Lincoln, Illinois.

### Defendants

### FSST

8.      Defendant FSST Management Services, LLC d/b/a 605 Lending ("FSST") is an online lender that offers loans to consumers at annual percentage rates of more than 700%. (Exhibit A) It purports to be an entity formed under the laws of, and claims to be owned and controlled by, the Flandreau Santee Sioux Tribe ("Tribe"), a federally-recognized Indian Tribe. (Exhibit A, page 1) It uses the address P.O. Box 305, Flandreau, SD 57028.

9.      FSST makes loans via the website 605lending.com. (Exhibit B)

10.      The server for 605lending.com is, as of June of 2025, located at the IP address 20.64.120.31, corresponding to a physical location in San Antonio, Texas, more than 1,000 miles away from the Flandreau Tribe's reservation in South Dakota.

11.      On information and belief, the Tribe receives less than 3% of the revenues generated from the loans made by FSST.

**Christensen**

12.     Steve Christensen holds himself out as the Chief Operating Officer of FSST. (Exhibit C)  He may be found at 305 S. 13th Street, Flandreau, SD  57028-1544.

**Dernier**

13.     Dustin Dernier holds himself out as the Chief Executive Officer of FSST Management Services, LLC. (Exhibit D) He may be found at 4313 SW Hickory Lane, Blue Springs, MO 64015-4518.

14.     On information and belief, Dernier is not a member of the Tribe.

**Infinity**

15.     Infinity Enterprise Lending Systems, a limited liability company ("Infinity"), is a limited liability company with its principal address at 4864 Sparks Blvd., Sparks, NV 89436.  Its registered agent is Corporation Creations Network, Inc., 8275 South Eastern Avenue, Suite 200, Las Vegas, NV 89123.

**Lead Bank**

16.     Lead Bank is a banking corporation chartered under Missouri law.  Its principal place of business is 1801 Main Street, Kansas City, MO 64108.  Lead Bank's registered agent is CT Corporation System, 5661 Telegraph Road, Suite 4B, St. Louis, MO 63129.

**Debt Direct**

17.     Debt Direct Portfolio Management LLC ("Debt Direct") is a limited liability company organized under New York law with a principal address of 1800 Elmwood Ave., Buffalo, NY 14207-2449.  It is a debt buyer, engaged in the business of purchasing and collecting consumer debts.

18.     Debt Direct is a debt collector as defined in the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. ("FDCPA").

**United Mediation**

19.     United Mediation Partners LLC ("United Mediation") is a limited liability company

4

organized under New York law with a principal address of 2001 Niagara Falls Blvd., Amherst, NY 14228-3519.  Its registered agent is Ristovska Olivera at that address.  It operates a collection agency, using the mails, telephone and Internet to collect consumer debts owed to others.

20.     United Mediation is a debt collector as defined in the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. ("FDCPA").

## John Does 1-20

21.     Defendants John Does 1-20 are other entities and individuals involved in the lending activity complained of.

## RELATIONSHIPS AMONG DEFENDANTS

### High-Interest Lending History of Flandreau Tribe and Dernier

22.     The Flandreau Tribe and Dernier have a long history of engaging in numerous rent-a-tribe schemes involving online lending, dating back to at least 2013.

23.     Dernier was a former manager of the Kansas City-based Rare Moon Media, LLC ("Rare Moon"), which ran a web of interrelated companies offering online payday loans at 600% APR and higher.

24.     These lenders rented post office boxes in small Caribbean countries and claimed to be located outside the United States, despite operating from Overland Park, Kansas.

25.     Around 2013, Rare Moon pivoted from a faux-offshore business model to a faux-tribal model which coincided with increased scrutiny from state and federal regulatory authorities towards "offshore" lenders.

26.     Many of Rare Moon's online lending companies then relocated from Charleston, Nevis, a tiny nation in the West Indies, to Flandreau, South Dakota.

27.     Seemingly overnight, these entities became "tribally owned."

28.     Further, the lending enterprises went from purportedly being subject to Nevis' laws to those of the Flandreau Tribe.

29.     However, the phone numbers, e-mail addresses, hours of operation, website

graphics, and customer service operations remained unchanged.

30.    The Tribe's involvement in the lending business is merely superficial. On information and belief, the Tribe's only real contribution is providing a cloak of sovereign immunity for illegal lending activities.

31.    The Tribe has been connected with a number of websites offering and making high-interest loans, most of which are no longer operating. These include:

   a.    Bottomdollarpayday.com;

   b.    Paradise Cash Advance;

   c.    Platinum B. Services;

   d.    Actionpayday.com;

   e.    Everestcashadvance1.com;

   f.    Fastfunds.com;

   g.    Ipltoday.com;

   h.    Mynextdaycash.com;

   i.    Northplainsfinancial.com;

   j.    Redleaflending.com;

   k.    Rushmorefinancial.Net;

   l.    Theviploanshop1.com.

32.    On information and belief, these websites represent "rent-a-tribe" schemes with different, non-tribal investor or investors.

33.    The online payday lender MyNextDayCash.com is but one example of a company that supposedly moved from Nevis to South Dakota.

34.    In 2011, MyNextDayCash was owned by Everest Cash Advance and was "governed by the laws of Nevis."

35.    A few years later, MyNextDayCash.com became a "tribally owned" enterprise, claiming it was "owned and operated by FSST Financial Services, LLC, dba MB Marketing, a tribal

lending entity wholly owned by the Flandreau Santee Sioux Tribe."

36.     In 2017, Rare Moon was dissolved, and Blue Dart Ventures was incorporated in its place.

37.     Rare Moon and Blue Dart Ventures shared common addresses, phone numbers, and officers/owners.

38.     Around this time, Rushmore Financial began operating RushmoreFinancial.net, which issued short-term loans to consumers at interest rates averaging 700% per year and was supposedly owned by the Flandreau Tribe via FSST.

39.     Credit inquiries that Rushmore Financial made to Trans Union and FactorTrust show the address associated with Rushmore Financial was "8900 Indian Creek Parkway, Suite 300, Overland Park, KS 66210, phone (913) 951-8339."

40.     Both the phone number and address belong to Blue Dart Ventures.

41.     After Rushmore Financial ceased its lending operations, it began redirecting potential customers to 605lending.com.

<u>**Infinity**</u>

42.     Infinity provides software to analyze, underwrite, service and collect high-interest loans.

43.     Infinity's website previously stated that its software "can support your vision… and your success. We have built the industry's best solution for Payday loan management. Our Business Rules Engine will meet your exact lending model and grow along with you. Schedule ACH transactions and reminder messages for automatic payment processes. Follow-up reminders will keep your CSR's on-task when working customer accounts. Refinancing a loan is as easy as clicking a button. Infinity is built to manage your Payday loan product no matter where you are lending."

44.     Infinity's loan software is used to operate lending websites, including managing borrower repayments via multiple methods including "ACH, debit card, and cash." https://infinitysoftware.com/payday-loan-software, accessed June 6, 2025.

45.    Infinity's website, infinitysoftware.com, is hosted on servers Infinity owns or manages, with an IP address of 169.55.60.156.  (Exhibit E)

46.    Infinity's server previously hosted 605lending.com.

47.    Infinity hosts more than 100 different lending websites on the same server, many of which claim sham "tribal" affiliations.

48.    Infinity's website even features testimonials from non-tribal individuals who are, nonetheless, listed as owners or executives of ostensibly "tribal" payday lenders.

49.    One such testimonial is from Dernier, who is identified as "CEO 605 Lending." (Exhibit F)

50.    Dernier states, "[t]he Infinity Team has helped us grow our start up into something to be very proud of. The entire team has been there for us every step of the way."

51.    John Humphrey, which the website identifies as "COO DMP Investments," provided another testimonial, stating, "[y]our software platform provided the ideal mix of processing capacity, high availability, and resource scalability that each proved vital components throughout our implementation. We sincerely appreciate the relationship with our friends at Infinity Software and consider their software platform an indispensable resource in operational  landscape." (Exhibit G)

52.    Infinity not only provides the means for FSST to underwrite and collect usurious loans via the software Infinity manages, but it also stores the software on servers that FSST can access.

53.    Without Infinity's software, no loan could have been made to Plaintiff.

54.    Infinity furnished the software that initiated ACH transactions to and from Plaintiff's account.

55.    Infinity received a portion of the profits FSST made from the usuriously high rates FSST charged and knew, or should have known, its software was facilitating illegal loans.

56.    Infinity frequently purchases consumer credit reports for high-interest loans.

57.    When purchasing credit reports for lenders, Infinity's name often appears alongside

8

the tribal lender's name and non-tribal beneficial owner.

## Loan Underwriting

58.    FSST utilizes Infinity's software to analyze loan applications and credit reports of applicants.

59.    Infinity's algorithms process the data and assign a proprietary risk score to the potential customer.

60.    FSST unilaterally determines the minimum qualifying score for loan approval, the interest rate, and repayment terms without the Flandreau Tribe's input.

61.     Infinity helps facilitate the pretense of the Flandreau Tribe's involvement in the loan process via the "tribal approval module," which transmits completed loan documents to an FSST Management employee in South Dakota, who simply clicks a box indicating loan approval, thereby allowing Dernier and his non-tribal investors to claim the "final loan approval" occurred on the Flandreau Tribe's land.

62.    After the FSST employee "approves" a loan, that loan is funded using money Dernier and his non-tribal investors directly control.

63.    On information and belief Dernier, the non-tribal investors:

    a.    Obtain consumer reports (credit reports) as agent or authorized service provider for FSST;

    b.    Evaluate and determine whether to make the loans applied for through the website;

    c.    Electronically transmit loan information to a person located on the Tribe's reservation who, after a cursory, pro forma review, grants the loan granted "final" approval;

    d.    Fund the loans using money kept in bank accounts that they control and to which the Tribe has no access;

    e.    Devise all material policies and procedures relating to the lending operations.

64.     No significant business activities related to lending actually occur on the Flandreau Tribe's reservation in South Dakota.

65.     In reality, Dernier, and his non-tribal investors beneficially own and operate FSST.

66.     FSST is not an "arm of the Flandreau Tribe" or entitled to claim a defense based on the Flandreau Tribe's sovereign immunity.

### Lead Bank's Role

67.     Lead Bank provides ACH and debit card payment processing services to the "tribal" online lending industry.

68.     In 2023, Lead Bank's website stated it serviced "those industries and people that have traditionally experienced a more challenging time accessing traditional banking services, like payment processing solutions. Therefore, we specialize in working with online lenders, state licensed lenders, tribal entities, third party payroll processors, money service businesses and others." *See* https://lead.bank/business/payments, accessed June 23, 2023.

69.     Lead Bank processes ACH payments for FSST.  Its website previously contained a testimonial from Dernier, who stated: "Using Lead Bank as our commercial banking and payments solutions partner has always been an asset for our business." (Exhibit H)

70.     Only a few small banks will process internet loan transactions.

71.     During 2013-2017, the Department of Justice sought to deny internet lenders access to the banking system in "Operation Choke Point."  Civil and criminal actions were brought against banks, including CommerceWest Bank, that processed internet loans.  Other large banks refused to handle such transactions.

72.     Lead Bank receives unusually large fees for processing internet lending transactions. Small, low-risk businesses typically pay 5 to 10 cents per ACH transaction, while larger businesses pay a fraction of a penny per transaction.  In contrast, "high risk" processors like Lead Bank often charge between 2% and 10% of the total dollar amount, meaning it can retain as much as $15 on a $150 transaction.

73.     The National Automated Clearing House Association ("NACHA") administers the ACH network, which implements numerous requirements participating payment processors such as Lead Bank must meet.

74.     One such requirement is that Originating Depository Financial Institutions ("ODFIs") such as Lead Bank must gather detailed information about the business operations of customers to whom they grant ACH network access.

75.     The ODFIs "are the gatekeepers of the ACH Network." *See* 2013 NACHA Operating Rules, Section 2.1 General Rule – ODFI is Responsible for Entries and Rules Compliance (2013 NACHA Operating Rules & Guidelines, Page OR4).

76.     As a result, Lead Bank was fully aware of the nature of FSST's business.

### Debt Direct

77.     Debt Direct purchases defaulted loans made via 605lending.com.

### United Mediation

78.     United Mediation collects the debts purchased by Debt Direct.

79.     United Mediation is the agent of Debt Direct with respect to such loans.

### FACTS RELATING TO PLAINTIFF

80.     Plaintiff obtained a series of installment loans from FSST via the website 605lending.com during the last several years.

81.     On or about May 19, 2023, Plaintiff obtained an installment loan from FSST. Plaintiff has been unable to locate the loan documents, but Exhibit A illustrates the form of loan agreement used. The loan had a disclosed annual percentage rate of more than 36%.

82.     On or about March 21, 2024, Plaintiff obtained an installment loan from FSST. Plaintiff has been unable to locate the loan documents, but Exhibit A illustrates the form of loan agreement used. The loan had an amount financed of $650 and a disclosed annual percentage rate of more than 36%.

83.     On or about May 22, 2024, Plaintiff obtained an installment loan from FSST.

11

Plaintiff has been unable the loan documents, but Exhibit A illustrates the form of loan agreement used. The loan had an amount financed of $500 and a disclosed annual percentage rate of more than 36%.

84.    On or about July 18, 2024, Plaintiff took out the most recent installment loan from FSST via the website 605lending.com. (Exhibit A) The loan had an amount financed of $1,100 and an annual percentage rate of 784.82%

85.    Plaintiff paid off all of the loans except the most recent.

86.    Exhibit A is a standard form loan agreement used by FSST on a regular basis. Another example is in Exhibit I.  These forms were used for all of the loans Plaintiff obtained.

87.    FSST regularly makes loans to individuals in Illinois at such rates.

88.    The loans were obtained for personal, family or household purposes and not for business purposes.

89.    At no time has FSST had a license from the Illinois Department of Financial and Professional Regulation or a state or federal banking or credit union charter, entitling it to make loans to Illinois residents at more than 9% interest.

90.    FSST nevertheless advertises and makes loans to Illinois residents at rates greatly exceeding 9%.

91.    Defendant FSST sought out Illinois residents for such loans.  Its website (Exhibit B) lists states in which it does not make loans.  Illinois is not excluded.

92.    The loans were disbursed to Plaintiff's account in Illinois via ACH transfer.

93.    Payments were to be made via ACH debits from Plaintiff's account in Illinois.

94.    Plaintiff obtained the loans over the Internet from Illinois.

95.    At no time was Plaintiff on the Tribe's reservation.

96.    Plaintiff made all of the payments on the earlier loans but was financially unable to pay the last loan.

97.    United Mediation called Plaintiff on January 22, 2026, leaving a voicemail, as follows:

Yes, my name is Mary Klein. I'm a paralegal with the United Mediation Group. I'm trying to get in touch with Rachel Lessen. I also have on this legal document also it is Rosalind Jones and Michael Robert Mueller. You need to contact my office immediately on 833-646-0687. When you call, please refer to case number 4340-305-7342.

98.    Mueller is Plaintiff's father.  Rosalind Jones is his partner.

99.    Plaintiff called back and spoke to "Mary."  "Mary" stated:

    a.    That Plaintiff owed over $3,000 but she would settle for $2,200 that day'

    b.    If Plaintiff did not pay immediately Mary was putting a lien against a house in Florida owned by Mueller.  Jones has a life estate and Plaintiff the remainder.

    c.    Mary would contact Mueller and Jones, who have no connection with the loan at issue.

    d.    Mary accused Plaintiff of fraud by not repaying the loan.

100.    Plaintiff was upset and distressed by the threats.

101.    United Mediation, at Plaintiff's request, sent a copy of the loan agreement. (Exhibit J)

102.    Plaintiff contacted FSST on January 23, 2026, and was told that the loan had been sold to Debt Direct. (Exhibit K)

103.    It is the policy and practice of Debt Direct to purchase loans made to Illinois residents at more than 9% interest by entities which do not have licenses from the Illinois Department of Financial and Professional Regulation or bank or credit union licenses.

104.    It is the policy and practice of United Mediation to collect loans made to Illinois residents at more than 9% interest by entities which do not have licenses from the Illinois Department of Financial and Professional Regulation or bank or credit union licenses.

### RENT-A-TRIBE SCHEMES

105.    The Tribe's involvement with FSST and 605lending.com is superficial, and its participation is often referred to as a "rent-a-tribe" scheme.

106.    In an attempt to evade prosecution under usury laws of states like Illinois and under

13

RICO, non-tribal owners of online payday lending businesses frequently engage in a business model commonly referred to as a "rent-a-tribe" scheme.

107.    In such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Native American tribes.

108.    The illegal payday loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation—funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections—are performed by individuals and entities that are unaffiliated with the tribe.

109.    In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

110.    However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

111.    To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in Breakthrough, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

112.    "In cases like this one, any tribal-immunity test regrettably must also serve another purpose: separating true arms of the tribe from shams. Unscrupulous lenders can seek out tribes to pose as figureheads, hide behind their sovereign immunity, and break state law scot-free.

Unfortunately, these rent-a-tribe schemes do happen. Jayne Munger, *Note, Crossing State Lines: The Trojan Horse Invasion of Rent-a-Bank and Rent-a-Tribe Schemes in Modern Usury Laws*, 87 Geo. Wash. L. Rev. 468, 478-79 (2019). To reserve tribal sovereign immunity for tribal sovereigns, our test must sift out impostors."  *Ransom v. Greatplains Fin., LLC,* 148 F.4th 141, 149 (4th Cir. 2025).

113.    These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

114.    Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

115.    Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one or shield non-members of the tribe. See, e.g., *United States v. Neff*, 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

116.    Tribes and their officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law." *Gingras v. Think Finance, Inc.,* 922 F.3d 112, 128 (2d Cir. 2019).

117.    Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

118.    As is the case with FSST, the lender typically states it is "tribally" owned and is therefore only subject to tribal law in fine print at the bottom of its website.

119.    The Tribe does not exercise substantial decision-making authority, and non-tribal owners perform the essential business functions off the reservation.

120.    The Tribe only has approximately 726 enrolled members.

121.    The Tribe's website fails to mention any online lending activities in terms of its economic development programs. See https://fsst-nsn.gov/economic-development/.

## ILLINOIS PROHIBITIONS ON PREDATORY LOANS

122.    Effective March 23, 2021, the Illinois Predatory Loan Prevention Act made it unlawful for anyone other than a bank to make loans to Illinois residents at annual percentage rates in excess of 36%. 815 ILCS 123/15-1-1 et seq. "Any loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

123.    Under 815 ILCS 123/15-10-5(b), "Any violation of this Act, including the commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act."

124.    Both before and after March 23, 2021, it was unlawful for anyone who did not have a bank or credit union charter or a consumer lending license issued by the Illinois Department of Financial and Professional Regulation to make loans at more than 9% interest.  205 ILCS 670/1.

125.    Any loans to Illinois residents at more than 9% that are made by unlicensed persons are void and unenforceable. 205 ILCS 670/20(d) ("Notwithstanding any other provision of this Section, if any person who does not have a license issued under this [Consumer Instalment Loan] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan.").

126.    Any loans to Illinois residents at more than 9% that are made by unlicensed lenders

16

violate the Interest Act, 815 ILCS 205/4, and are subject to statutory damages under 815 ILCS 205/6.

127.    Illinois has a criminal usury statute defines the making of a loan by unlicensed persons at more than 20% interest as a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1 et seq). It applies to a person who "while either within or outside the State, by his own conduct or that of another for which he is legally accountable," engages in conduct that amounts to an offense if "the offense is committed either wholly or partly within the State." 720 ILCS 5/1-5.

128.    Contracts made in violation of licensing requirements intended to protect the public, or in violation of criminal laws imposing substantial penalties, are void. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48 (2005). Neither choice of law clauses or other contractual devices can be used to avoid invalidation of loans made at criminally usurious rates. *Madden v. Midland Funding, LLC,* 237 F. Supp. 3d 130, 150  (S.D.N.Y. 2017) ("That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy."); *MacDonald v. CashCall, Inc.,* 16cv2781, 2017 U.S. Dist. LEXIS 64761, *6, 2017 WL 1536427, *7 (D.N.J., April 28, 2017); *Jackson v. Payday Fin., LLC,* 764 F.3d 765 (7th Cir. 2014).

129.    The Illinois Department of Financial and Professional Regulation has repeatedly brought cases against unlicensed out of state tribal and other lenders that make loans via the Internet or similar means to Illinois residents in Illinois. *E.g.*, *In the Matter of Red Leaf Ventures, LLC*, No. 12 CC 569 (https://www.idfpr.com/dfi/ccd/Discipline/RedLeafVenturesCDOrder12CC569.pdf), *In the Matter of Money Mutual, LLC*, No. 12 CC 408 (https://www.idfpr.com/dfi/ccd/Discipline/MoneyMutualCDOrder12CC408.pdf); *In the Matter of Hammock Credit Services*, No. 12 CC 581 (https://www.idfpr.com/dfi/ccd/Discipline/HammockCreditCDOrder12CC581.pdf); *In the Matter of Makes Cents, Inc., d/b/a Maxlend*, No. 17 CC 133 (https://www.idfpr.com/dfi/CCD/Discipline/17CC133%20-%20Make%20Cents%20dba%20Maxlend%20Cease%20and%20Desist%20Order%20Bob%208%2016%202017.pdf).

## COUNT I - DECLARATORY AND INJUNCTIVE
## RELIEF AGAINST ILLEGAL CONDUCT

130.    Plaintiff incorporates paragraphs 1-129.

131.    This claim is against all Defendants.

132.    There is a controversy between Plaintiff and the class, on the one hand, and Defendants, on the other, as to whether Plaintiff must repay the loans made to her.

133.    Declaratory relief will resolve such controversy.

134.    An injunction is necessary to prevent Defendants from taking any action to collect the void debts.

## CLASS ALLEGATIONS

135.    Plaintiff brings this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and (b)(2). Alternatively, Plaintiff seeks (b)(3) certification.

136.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of "605 Lending" at more than 9% interest (c) which loan has not been paid in full.

137.    Plaintiff may alter the class definition to conform to developments in the case and discovery.

138.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, and the fact that debts are normally placed for collection in portfolios of similar debts, there are at least 100 class members.

139.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

140.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

18

141. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

142. Defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate.

143. The class members are entitled to a declaration that Defendants are not entitled to collect on the loans described, an injunction against any further collection efforts by Defendants, and restitution of all such amounts collected by Defendants.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

      i.      Injunctive relief;

      ii.     Declaratory relief;

      iii.    Restitution of all amounts collected on the loans from members of the class;

      iv.    Costs of suit; and

      v.     Such other and further relief as the Court deems proper.

## COUNT II – ILLINOIS INTEREST ACT

144. Plaintiff incorporates paragraphs 1-129.

145. This claim is against all Defendants.

146. Defendants contracted for and collected loans at more than 9% interest from Plaintiff and the class members, in violation of 815 ILCS 205/4.

147. Plaintiff and the class members are entitled to statutory damages under 815 ILCS 205/6.

## CLASS ALLEGATIONS

148. Plaintiff brings this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and (b)(3).

149. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was

19

made in the name of FSST Management Services, LLC d/b/a 605 Lending at more than 9% interest (all of its loans qualify) (c) which loan is still outstanding or has been paid on or after a date two years prior to the filing of suit.

150.    Plaintiff may alter the class definitions to conform to developments in the case and discovery.

151.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, and the fact that debts are normally placed for collection in portfolios of similar debts, there are at least 100 members of the class.

152.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

153.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

154.    Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

155.    A class action is superior for the fair and efficient adjudication of this matter, in that:

a.        Individual actions are not economically feasible.

b.        Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

i.        Damages as provided in 815 ILCS 205/6.

ii.        Attorney's fees, litigation expenses and costs of suit; and

iii.        Such other and further relief as the Court deems proper.

20

## COUNT III – PREDATORY LOAN PREVENTION ACT
## AND ILLINOIS CONSUMER FRAUD ACT

156.     Plaintiff incorporates paragraphs 1-129.

157.     This claim is against all Defendants.

158.     Defendants contracted for and collected loans prohibited by the Illinois Predatory Loan Prevention Act.

159.     Violation of the Predatory Loan Prevention Act is a violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1 et seq.

## CLASS ALLEGATIONS

160.     Plaintiff brings this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and (b)(3).

161.     The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of FSST Management Services, LLC d/b/a 605 Lending at more than 36% interest (all of its loans qualify) (c) on or after March 23, 2021.

162.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

163.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, and the fact that debts are normally placed for collection in portfolios of similar debts, there are at least 100 members of the class.

164.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

165.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

166.     Plaintiff's claim is typical of the claims of the class members. All are based on the

21

same factual and legal theories.

167.    A class action is superior for the fair and efficient adjudication of this matter, in that:

    a.    Individual actions are not economically feasible.

    b.    Members of the class are likely to be unaware of their rights;

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

    i.    Compensatory damages;

    ii.    Punitive damages;

    iii.    Attorney's fees, litigation expenses and costs of suit; and

    iv.    Such other and further relief as the Court deems proper.

## COUNT IV – RICO

168.    Plaintiff incorporates paragraphs 1-129.

169.    This claim is against Steve Christensen and Dustin Dernier, who are the RICO "persons."

170.    All loans made in the name of FSST Management Services, LLC d/b/a 605 Lending to Illinois residents are (a) unenforceable under Illinois law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Illinois law, where (c) the usurious rate is at least twice the enforceable rate (9%).

171.    The loans are therefore "unlawful debts" as defined in 18 U.S.C. §1961(6).

172.    FSST Management Services, LLC d/b/a 605 Lending is an enterprise affecting interstate commerce, in that it is located outside of Illinois and makes loans to Illinois residents via the Internet.

173.    Defendants Steve Christensen and Dustin Dernier are associated with this enterprise, in that they hold executive positions with, and direct the making of loans by, FSST Management Services, LLC d/b/a 605 Lending.

174.     Defendants Steve Christensen and Dustin Dernier conducted or participated in the conduct of the affairs of FSST Management Services, LLC d/b/a 605 Lending through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. §1962(c).

175.     Plaintiff was deprived of money as a result.

## CLASS ALLEGATIONS

176.     Plaintiff brings this claim on behalf of a class.

177.     The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of FSST Management Services, LLC d/b/a 605 Lending at more than 9% interest (c) which loan was made on or after a date 4 years prior to the filing of suit.

178.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

179.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

180.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

      a.     Whether the loans at issue are "unlawful debts" as defined in RICO.

      b.     Whether FSST Management Services, LLC d/b/a 605 Lending is an "enterprise."

      c.     Whether Defendants Steve Christensen and Dustin Dernier are associated with FSST Management Services, LLC d/b/a 605 Lending.

      d.     Whether Defendants Steve Christensen and Dustin Dernier, conducted or participated in the affairs of FSST Management Services, LLC d/b/a 605 Lending through a pattern of making and collecting unlawful loans.

e.      Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

181.    Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

182.    A class action is superior for the fair and efficient adjudication of this matter, in that:

a.      Individual actions are not economically feasible.

b.      Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

i.      Treble damages;

ii.     Attorney's fees, litigation expenses and costs of suit; and

iii.     Such other or further relief as the Court deems proper.

## COUNT V – FDCPA

183.    Plaintiff incorporates paragraphs 1-129.

184.    This claim is against Debt Direct and United Mediation ("Defendants").

185.    Defendants violated the FDCPA, 15 U.S.C. §§1692e, 1692e(2), 1692e(4), 1692e(5), 1692e(7), 1692e(10), 1692f and 1692f(1), by (a)  collecting usurious loans made to Illinois residents, (b) threatening to communicate with persons prohibited under 15 U.S.C. §1692b, (c) accusing Plaintiff of fraud, (d) threatening to take action (placing a lien on property) that can only be taken after a lawsuit is filed and a judgment obtained.

186.    Defendants' communications represent or imply that the underlying debts are legally enforceable. *McMahon v. LVNV Funding, LLC,* 744 F.3d 1010 (7th Cir. 2014).

187.    Section 1692e provides:

False or misleading representations

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . .

24

(2)     The false representation of—

    (A)      the character, amount, or legal status of any debt; . . .

(4)     The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.

(5)     The threat to take any action that cannot legally be taken or that is not intended to be taken. . . .

(7)     The false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer. . . .

(10)    The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. . . .

188.    Section 1692f provides:

Unfair practices

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1)     The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law. . . .

189.    The Federal Trade Commission has stated: "Legality of charges. A debt collector may attempt to collect a fee or charge in addition to the debt if either (a) the charge is expressly provided for in the contract creating the debt and the charge is not prohibited by state law, or (B) the contract is silent but the charge is otherwise expressly permitted by state law. Conversely, a debt collector may not collect an additional amount if either (A) state law expressly prohibits collection of the amount or (B) the contract does not provide for collection of the amount and state law is silent." (FTC Official Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed. Reg. 50097, 50108 (Dec. 13, 1988).)

190.    All "605 Lending" loans made to Illinois residents are unenforceable under Illinois law because of the laws relating to usury.

25

## CLASS ALLEGATIONS

191.    Plaintiff brings this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and (b)(3).

192.    The class consists of (a) all individuals with Illinois addresses (b) whose FSST loans United Mediation communicated with in an effort to collect  (d) on or after a date 1 year prior to the filing of suit and on or before a date 30 days after the filing of suit.  Plaintiff defines a subclass of class members whose loans were owned by Debt Direct (the subclass is likely coterminous with the class).

193.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, and the fact that debts are normally placed for collection in portfolios of similar debts, there are at least 40 class members.

194.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

      a.    Whether the loans at issue are usurious and unenforceable.

      b.    Whether the attempted collection of the loans violates the FDCPA.

195.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

196.    A class action is appropriate for the fair and efficient adjudication of this matter, in that:

      a.    Individual actions are not economically feasible.

      b.    Members of the class are likely to be unaware of their rights.

      c.    Congress prescribed class actions as the principal means of enforcing the FDCPA.

26

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

        i.      Statutory damages;

        ii.     Actual damages;

        iii.    Attorney's fees, litigation expenses and costs of suit; and

        iv.    Such other or further relief as the Court deems proper.


*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Dulijaza (Julie) Clark
Alexandra Huzyk
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603-1841
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:  courtecl@edcombs.com
Dedelman@edcombs.com
Jclark@edcombs.com
ahuzyk@edcombs.com

## JURY DEMAND

Plaintiff demands trial by jury.

/s/ Daniel A. Edelman
Daniel A. Edelman

## <u>NOTICE OF LIEN AND ASSIGNMENT</u>

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.


*/s/ Daniel A. Edelman*
Daniel A. Edelman

## DOCUMENT PRESERVATION DEMAND

Plaintiff hereby demands that defendants take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to plaintiff, the events described herein, any third party associated with any telephone call, campaign, account, loan, sale or file associated with plaintiff, and any account or loan or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If defendants are aware of any third party that has possession, custody, or control of any such materials, plaintiff demands that defendants request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the defendants.

*/s/ Daniel A. Edelman*
Daniel A. Edelman